UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.

RALPH WILSON,

Defendant.

Criminal Action No. 96-319-02 (CKK)
Civil Action No. 00-2194 (CKK)

**MEMORANDUM OPINION**
(August 30, 2005)

This matter relates to the conviction and sentencing of Petitioner Ralph Wilson for

charges related to the death of Leroy Copeland, a government witness in the trial of James

Wilson, Petitioner's brother.  Currently before the Court is Petitioner's Motion to Vacate, Set

Aside or Correct Sentence pursuant to 28 U.S.C. § 2255.  Petitioner claims that he is entitled to

relief because (1) he received ineffective assistance of counsel in violation of the Sixth

Amendment, (2) the Government did not disclose exculpatory information in a timely fashion

before trial in violation of the Fifth Amendment right to Due Process and *Brady v. Maryland*,

373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and (3) his confrontation rights under the

Sixth Amendment were violated.  Additionally, Petitioner adopts the arguments and authorities

set forth in the separate Section 2255 motion of his co-defendant and brother, Louis A. Wilson.[1]

Petitioner requests an evidentiary hearing to resolve the issues raised in his motion.  The

Government opposes Petitioner's motion.  After a careful review of the parties' multiple briefs

and the relevant case law, the Court finds that an evidentiary hearing is unnecessary to the

---

[1] The Court shall treat the claims each party has argued in its Memorandum Opinion
dealing with that party's motion.

resolution of Petitioner's motion.[2]  For the reasons set forth below in this Memorandum Opinion,

the Court shall deny Petitioner's Motion to Vacate, Set Aside or Correct Sentence pursuant to 28

U.S.C. § 2255.

## I: BACKGROUND

This Section 2255 motion arises out of the murder of a Government witness scheduled to

testify in the trial of James "Toe" Wilson, who was charged with robbing a United States Post

Office.  The Government's case against James Wilson was based primarily on information

obtained by a witness, decedent Leroy Copeland, who had taped a conversation with James

Wilson at the Lorton Reformatory ("the Lorton conversation") on July 28, 1995.  Tr. 2A:8; 4:13,

125.[3]  The Government turned over copies of the tape and transcript of the Lorton conversation,

which revealed Copeland's identity, to James Wilson's attorney, Mr. Steven Jacoby, on the

condition that the attorney not share copies of the tape and transcript with anyone without the

Government's prior permission.  Tr. 3:20-26, 105-07; GX:34.  Shortly before the March 26,

1996, trial date, on March 20, James Wilson's attorney met with James's wife and brother Ralph

to discuss the evidence against James.  Tr. 3:108-09; 7:100-01.  During the meeting, James's

---

[2] The Court has considered the following briefs in its ruling: (1) Petitioner Ralph Wilson's Motion to Vacate, Set Aside or Correct Sentence ("Pet'r Mot."), (2) Government's Opposition to [Petitioner's] Motion ("Gov't Opp'n"), (3) Petitioner's Memorandum in Response to Government's Opposition ("Pet'r Resp."), (4) Petitioner's Supplemental Motion and Memorandum to 28 U.S.C. § 2255 Motion ("Pet'r Supp."), (5) Petitioner's Notice of New Case Authority ("Pet'r Not.), (6) Government's Opposition to [Petitioner's] Supplemental Motion and Notice of New Case Authority ("Gov't Opp'n to Pet'r Supp."), and (6) Petitioner's Reply to Government's Opposition to Defendant's Supplemental Motion and Notice of New Case Authority (Pet'r Reply to Gov't Opp'n to Pet'r Supp.").

[3] References to the trial transcripts herein are by volume number and by page (e.g., Volume I at page 5 is "Tr. 1:5"), or where no volume number is indicated, referenced by date (e.g., 1/22/97 Tr. 1").

attorney alerted the family members to Copeland's role in the case against James by playing

portions of the Lorton conversation between Copeland and James Wilson.  Tr. 3:109-124; 7:101.

On the evening of March 25, 1996, Leroy Copeland was shot and killed at 5th and O Streets,

N.W., in Washington D.C.  Tr. 4:17-18, 22-23, 56; 6:100-01, 125-126.

On September 19, 1996, Defendants Louis "Spuds" Wilson and Ralph Wilson, brothers

of James Wilson, along with another co-defendant, Marcellus Judd, were charged with (1)

conspiracy to kill a federal witness in violation of 18 U.S.C. § 371, (2) killing a federal witness in

violation of 18 U.S.C. § 1512(a)(1)(A), (3) retaliation against a federal witness in violation of 18

U.S.C. § 1513(a)(1)(B) and (2), and (4) first degree murder while armed in violation of D.C.

Code §§ 2401 and 3202.  Defendant Louis Wilson was additionally charged with two counts of

using a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c),

and possession of a firearm during a crime of violence in violation of D.C. Code § 22-3204(b).

Following a trial in front of the Honorable Norma Holloway Johnson, Defendants Louis and

Ralph Wilson were found guilty on all counts by a jury on March 21, 1997.  On June 5, 1997,

Defendant Ralph Wilson's Motion to Set Aside the Verdict was denied, and he was sentenced to

life imprisonment in June 1997; Louis Wilson was sentenced to life imprisonment plus two

consecutive five year terms of imprisonment in September 1997.  On June 10, 1997, Defendant

Ralph Wilson noted his appeal.

On November 20, 1998, the United States Court of Appeals for the District of Columbia

affirmed all convictions of the Wilsons except for one; the Court vacated one of Louis Wilson's

convictions for using a firearm during and in relation to a crime of violence in violation of 18

U.S.C. § 924(c).  *See United States v. Wilson*, 160 F.3d 732 (D.C. Cir. 1998).[4]  On October 4,

1999, the Supreme Court of the United States denied the Wilsons's petition for writ of certiorari.

*Wilson v. United States*, 528 U.S. 828, 120 S.Ct. 81, 145 L.Ed.2d 69 (1999).  Petitioner Ralph

Wilson timely filed the instant motion on August 28, 2000, and then filed a Motion for Leave to

Supplement 28 U.S.C. § 2255 Motion and the instant Supplemental Motion and Memorandum to

28 U.S.C. § 2255 Motion on December 18, 2003.  Briefing was completed on the relevant filings

on September 13, 2004.

## II: LEGAL STANDARD

Under Section 2255 of Title 28 of the United States Code, a prisoner in custody sentenced

in a federal court may move the sentencing court to vacate, set aside, or correct the sentence if

the prisoner believes his sentence was imposed "in violation of the Constitution or laws of the

United States . . . or that the sentence was in excess of the maximum authorized by law . . . ."  28

U.S.C. § 2255 (2005).   However, a district court judge need not conduct an evidentiary hearing

before denying a Section 2255 motion when "the motion and files and records of the case

conclusively show that the prisoner is entitled to no relief."  *Id.*; *United States v. Morrison*, 98

F.3d 619, 625 (D.C. Cir. 1996).  As the rules governing Section 2255 proceedings provide, "[i]f

it plainly appears from the face of the motion and any annexed exhibits and the prior proceedings

in the case that the movant is not entitled to relief in the district court, the judge shall make an

order for its summary dismissal . . . ."  Rules Governing § 2255 Proceedings, Rule 4, 28 U.S.C.

foll. § 2255 (2005).  Accordingly, a Section 2255 petitioner is not automatically entitled to an

---

[4] The D.C. Circuit reversed the convictions against co-defendant Marcellus Judd on the grounds of insufficiency of evidence.  *U.S. v. Wilson,* 160 F.3d at 739.

evidentiary hearing, and should not receive one if his allegations are "vague, conclusory, or palpably incredible" rather than "detailed and specific." *Machibroda v. United States*, 368 U.S. 487, 495, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962); *see also United States v. Pollard*, 959 F.2d 1011, 1031 (D.C. Cir. 1992), *cert. denied*, 506 U.S. 915, 113 S.Ct. 322, 121 L.Ed.2d 242 (1992) ("Only where the § 2255 motion raises 'detailed and specific' factual allegations whose resolution requires information outside of the record or the judge's 'personal knowledge or recollection' must a hearing be held.") (quoting *Machibroda*, 368 U.S. at 495); *United States v. McGill*, 11 F.3d 223, 225 (1st Cir. 1993) ("[E]videntiary hearings are the exception, not the rule."). This is so even if the files and records of the case do not clearly rebut the allegations of the claim. *Id.* The party seeking an evidentiary hearing in a Section 2255 proceeding therefore carries a fairly high burden of demonstrating a need for such a hearing, and the decision whether to grant one is "committed to the district court's discretion." *Pollard*, 959 F.2d at 1031.[5]

### III: DISCUSSION

In his Section 2255 motion presently before the Court, Petitioner alleges violations of his Sixth Amendment rights to effective assistance of counsel and confrontation of witnesses against him. *See* Pet'r Mot. at 2-4; *see also* Pet'r Notice of New Case Authority at 1. Petitioner also

---

[5] Petitioner's trial and sentencing were conducted before the Honorable Chief Judge Norma Holloway Johnson, who has retired since the filing of the instant Motion in September 2000. On March 24, 2003, Petitioner's case was reassigned to the Honorable Judge Colleen Kollar-Kotelly. The Court is mindful that because a different judge presided over Petitioner's trial and sentencing, the decision to deny Petitioner's request for an evidentiary hearing may be reviewed under a less deferential standard, and the Court has therefore taken extra care in scrutinizing the parties' filings for the instant motion. *See Morrison*, 98 F.3d at 625 ("[A] district judge's decision not to hold an evidentiary hearing before denying a § 2255 motion is generally respected as a sound exercise of discretion when the judge denying the § 2255 motion also presided over the trial in which the petitioner claims to be prejudiced.").

alleges that he has been denied his right to Due Process guaranteed under the Fifth Amendment because the government tardily disclosed potentially exculpatory information in violation of *Brady v. Maryland*. *See id.* at 2. Finally, in his Supplemental Motion, Petitioner claims that the district court improperly instructed the jury on the elements of the offense and the law in its instructions for Count Two of the indictment, killing a government witness in violation of 18 U.S.C. § 1512(a)(1)(A). *See* Pet'r Supp. at 2. The Court shall treat the substantive aspects of each claim in sequence, as well as any procedural aspects that exist with respect thereto.

A.    *Ineffective Assistance of Counsel Claims*

Petitioner's first theory is that his conviction and sentence for charges related to the death of Leroy Copeland should be vacated, set aside, or corrected because Petitioner did not receive effective assistance of counsel at trial in violation of the Sixth Amendment. Pet'r Mot. at 2-4, 12-23. Petitioner launches a volley of claims challenging his trial counsel's performance, alleging that his trial counsel -- Messrs. David Howard, Esq., and Gregory Spencer, Esq., of the Federal Public Defender Service -- (1) failed to file a motion for recusal of the trial judge, move for a mistrial based on the perceived animosity of the trial judge, or request a limiting jury instruction concerning such perceived animosity; (2) failed to move for a continuance to investigate potentially exculpatory statements; (3) refused to request a continuance to allow Petitioner's pre-trial counsel, Ms. Reita Pendry, Esq., to be available for trial; (4) failed to present material witnesses in support of Petitioner's defense; (5) had a conflict of interest that deprived Petitioner of material evidence in support of his defense; and (6) declined to explore plea negotiations despite Petitioner's request to do so. *Id*.

6

Under the test for ineffective assistance of counsel established in *Strickland v. Washington*, a successful claim must meet two requirements.  466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  First, a party must show that his attorney's deficient performance was "so serious that counsel was not functioning as the 'counsel' guaranteed [] by the Sixth Amendment."  *Id*.  A court conducting an inquiry should measure attorney performance under "prevailing professional norms," and "[j]udicial scrutiny of counsel's performance must be highly deferential."  *Id*. at 688, 689, 104 S.Ct. 2052.  In short, a petitioner must overcome a strong presumption that counsel rendered adequate and effective assistance.  *See id*. at 690, 104 S.Ct. 2052 ("[T]he Court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable judgement."); *see also United States v. Askew*, 88 F.3d 1065, 1070-71 (1996) (explaining *Strickland* standard for deficient performance); *United States v. Mitchell*, 216 F.3d 1126, 1130-31 (2000) (same).

Second, it is not enough to show that counsel's performance was professionally deficient, but there must also be prejudice sufficient to create a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694, 104 S.Ct. 2052.  That some effect on the outcome of trial is conceivable does not meet the level of prejudice contemplated in *Strickland*.  *Id*. at 693, 104 S.Ct. 2052.  Finally, a court deciding an ineffective assistance of counsel claim does not need to address both the deficient performance and prejudice components of the inquiry if there has been an insufficient showing on one prong.  *Id*. at 697, 104 S.Ct. 2052.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  *Id*.  Accordingly, Petitioner must show that his trial counsel made professional errors

sufficient to affect the outcome at trial.

      1.     <u>Failure to File a Motion for Recusal or Mistrial Based on the Perceived<br>Animosity of the Trial Judge, or Request an "Animosity" Jury Instruction</u>

Petitioner's first ineffective assistance claim rests on the idea that his trial counsel should have filed for a recusal or a mistrial *during trial* based on the perceived animosity of the trial judge, or sought a limiting jury instructing concerning such perceived animosity. Pet'r Mot. at 12. According to Petitioner, "the animosity of the trial judge continued throughout the trial," which allegedly exposed bias to the jury, and "counsel did not move for a mistrial when the conduct became apparent." *Id*. at 13. In support of this argument, Petitioner submits an affidavit from Mr. David Howard, one of Petitioner's trial counsel, as well as a motion for recusal filed in June 1997 in a different case against Petitioner before the same judge. *See* Att. 6 to Pet'r Mot. (Howard Affidavit);[6] Att. 1 to Pet'r Mot. (recusal motion highlighting the portions of the trial record in the present case perceived to convey hostility on the part of the trial judge directed at Petitioner's trial counsel).[7] After reviewing the submitted affidavits and the portions of the trial record highlighted by trial counsel in the attached motion for recusal, and placing them in the greater context of the entire trial, the Court finds that trial counsel's performance was not deficient since there are no grounds for recusal, mistrial, or an animosity instruction based on

---

      [6] Mr. Howard states in his affidavit: "The court was somewhat abrupt and compromised my ability to provide effective assistance of counsel. . . . The jury could not help but have a tainted perception of me because of the manner in which the court addressed me throughout the trial." Att. 6 to Pet'r Mot.

      [7] The motion for recusal was filed in *United States v. Ralph Todd Wilson*, Criminal Case Number 96-157, also before Chief Judge Norma Holloway Johnson.

the trial judge's conduct.[8]  Without such grounds, Petitioner has not and cannot establish that his

trial counsel's failure to move for recusal, mistrial, or an animosity instruction at trial, constituted

deficient performance, nor can he establish the required prejudice resulting from trial counsel's

failure such that the Court's confidence in the outcome of the proceeding is undermined.  *See*

*Strickland*, 466 U.S. at 694.[9]

Grounds for recusal, mistrial, or an animosity instruction did not exist in this case because

the trial judge's actions did not rise to the level of "deep-seated favoritism or antagonism that

would make fair judgment impossible."  *Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct.

1147, 127 L.Ed.2d 474 (1994).  In *Liteky*, the Supreme Court noted that "judicial remarks during

the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or

their cases, ordinarily do not support a bias or partiality challenge."  *Id*.  Petitioner cites *United*

*States v. Donato*, 99 F.3d 426, 434-38 (D.C. Cir. 1996) for his contention that "the one-sidedness

of the court's hostility was such that defendant did not receive a fair trial."  Pet'r Mot. at 13.

While the court in *Donato* held that criticism from a trial judge may be so hostile as to deprive a

party's right to a fair trial, *id*. at 435, 438, the court also emphasized that "a district judge has

_____

[8] The Court notes that the recusal issue was not raised on appeal, but finds it necessary to dispose of the issue before treating the ineffective assistance of counsel claim based on failure to seek recusal.  *See* Att. 2 to Pet'r Mot. (affidavit of Ms. Reita Pendry, appellate counsel for Petitioner, explaining that she chose not to raise the issue of trial judge's treatment of trial counsel on appeal, despite Petitioner's request that she do so, due to page limitations imposed by the United States Court of Appeals for the District of Columbia).  Appellate counsel exercised her judgment as to which issues merited briefing.  Based on the trial court's finding that there was no basis to seek recusal, any claim that appellate counsel was ineffective lacks merit.

[9] Petitioner's request that "the trial judge recuse herself from handling this motion given the nature of the claim," Pet'r Mot. at 13 n.2,  is rendered moot by virtue of the fact that the Honorable Chief Judge Norma Jean Holloway has retired, and the Honorable Judge Colleen Kollar-Kotelly has been reassigned to this case as of March 24, 2003.

wide discretion in monitoring the flow of a criminal trial. . . . Sharp words spoken by a trial court

to counsel do not by themselves establish impermissible bias." *Id*. at 434; *see United States v.*

*Clark*, 184 F.3d 858, 868-69 (D.C. Cir. 1999) (finding that defendant received a fair trial despite

contention that the court undermined his defense by directing unjustified harshness and criticism

at trial counsel in the presence of the jury). In this case, the allegations of hostility involve

adverse rulings by the trial judge, most of which included an explanation of the basis for her

rulings.

Here, the entirety of the trial record shows that the presiding trial judge was even-handed

in the way she monitored the flow of trial. *See* Gov't Opp'n at 23 n.20 (citing numerous

examples of trial court's criticism of government counsel). Moreover, the trial judge took care to

instruct the jury at the opening and closing of trial not to let her actions and rulings affect the

jury's consideration of the case, and jurors are presumed to follow the court's instructions.[10] *See*

---

[10] In its opening instructions, the Court told the jury that:

> My actions . . . during the trial in ruling on motions or objections by
> counsel or in any comments I may make to counsel or in any questions I
> may put to witnesses, or even my actions in setting for the law in these
> instructions to you, are not to be taken by you as any indication of my
> opinion as to how you should determine the issues of fact. If you come to
> believe during the course of this trial that I have expressed or even hinted at
> any opinion as to the facts, you are instructed to totally disregard it. You
> may consider only the evidence properly admitted in this case.

Tr. 2:34. And similarly in its closing instructions, the Court told the jury that:

> My actions during the course of this trial in ruling on any motions
> or objections I may have heard from counsel, any comments that I
> may have made to counsel, any questions that I may have put to
> witnesses, or my actions in setting forth the law in these instructions
> to you are not – and I will repeat that. My actions are not to be
> taken by you as any indication of my opinion as to how you should

*Zafiro v. United States*, 506 U.S. 534, 540, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993) (finding

presumption that jury follows court's instructions).  Importantly, the court's allegedly hostile

conduct was directed at Petitioner's counsel, not at Petitioner or witnesses.  Att. A to Pet'r Mot.

Accordingly, the jury heard nothing to suggest, as Petitioner argues, that the Court's perceived

animosity toward Petitioner's counsel was based on a bias against Petitioner.  *See Donato*, 99

F.3d at 438 (finding it significant that some of court's criticism was directed at defendant in

holding that defendant was deprived of fair trial); *Clark*, 184 F.3d at 869 (finding it significant

that court directed its allegedly hostile comments to attorneys rather than defendant in holding

that defendant received fair trial).

Without sufficient grounds for recusal, mistrial, or an animosity instruction, trial

counsel's motion would likely have been denied.[11]  Therefore, Petitioner cannot establish that

trial counsel should have moved the trial court for any of these reasons, and acted unreasonably

for not doing so.[12]  *See Strickland*, 466 U.S. at 690.  Furthermore, because the trial would most

---

determine the issues of fact.

If you believe that I have expressed or intimated any opinion as to
the facts, not only should you disregard it, I instruct you [to] totally
disregard it.  What the verdicts shall be in this case is your sole and
exclusive duty and responsibility.

3/14/97 Tr. 5-6.

[11] Petitioner's Motion for Recusal in Cr. Case No. 96-157, Att. A to Pet'r Mot., was
denied by Judge Norma Holloway Johnson on June 17, 1997.  Cr. No. 96-157, Dkt. Entry #27.

[12] Moreover, the Court notes that trial counsel in fact  made a reasoned choice not to seek
a recusal or mistrial and finds that this decision was "within the wide range of professionally
competent assistance."  *Strickland*, 466 U.S. at 690.  In his November 2000 affidavit submitted
as Appendix G to the Government's Opposition, W. Gregory Spencer, who represented
Petitioner at trial with David Howard, recalls: "Mr. Howard and I did not . . . file a recusal

likely have proceeded exactly as it did even if Petitioner's trial counsel had moved for recusal, mistrial or an animosity instruction, Petitioner cannot show prejudice such that but for his trial counsel's deficient performance, the result of the proceeding would have been different.  *See id.* at 694; *see also United States v. Holland*, 117 F.3d 589, 594 (D.C. Cir. 1997) ("A lawyer is not ineffective when he fails to file a frivolous pleading."); *United States v. Glover*, 153 F.3d 749, 758 (D.C. Cir. 1998) (counsel is not ineffective for failing to make a frivolous objection).

2.      Failure to Request Continuance to Investigate Eddings's Statements

Petitioner's next ineffective assistance of counsel claim rests on the notion that his trial counsel should have requested a continuance to investigate allegedly exculpatory statements by a witness, Mr. Kevin Eddings, disclosed to defense counsel the evening preceding Eddings's testimony at trial.  Pet'r Mot. at 13; *see* Apps. H and I to Gov't Opp'n (Eddings's 4/19/96 stmt. to the police, Tr. 6:130, 137, and Eddings's grand jury testimony on 5/1/96, Tr. 6:132-33, 140). According to Petitioner, Eddings's statements "strongly implied that another individual other than those on trial had shot and killed Mr. Leroy Copeland," namely, that witness Kirk Thomas had done so.  *Id*. at 15.  Therefore, argues Petitioner, his trial counsel should have sought a continuance to determine whether a third-party shooter defense could be mounted based on Eddings's statements, rather than "wing[ing] it by cross-examination," as his trial counsel purportedly did.  *Id*.

As an initial matter, Petitioner overstates the contents of these statements; they did not "strongly imply" anything, rather they simply indicated that Eddings recalled others being nearby

---

motion or move for a mistrial because we did not think that such motions would be granted and seeking a motion that might further alienate the Court that we also knew would not be granted would not be in Mr. Wilson's best interest."  App. G to Gov't Opp'n ¶ 5.

when Copeland was murdered. *See* App. H to Gov't Opp'n at 6; App. I to Gov't Opp'n at 16, 17, 23. That aside, Petitioner fails to establish what information the defense stood to gain from interviewing and investigating Eddings. In addition, Petitioner does not establish the requisite prejudice to support a claim of ineffective assistance of counsel, i.e. a reasonable probability that the result of trial would have been different if not for the failure of trial counsel to seek a continuance to investigate Eddings. *See Strickland*, 466 U.S. at 694. As explained in detail below, the Court concludes that this prong of Petitioner's ineffective assistance claim does not warrant setting aside, vacating, or correcting his sentence pursuant to 28 U.S.C. § 2255.

The Court is guided by *United States v. Askew*, in which the D.C. Circuit held that when a convicted defendant attempts to gain collateral relief based on failure of trial counsel to investigate, a court should require the petitioner to show "to the extent possible precisely what information would have been discovered through further investigation." 88 F.3d at 1073. The Court explained:

> Any other rule would give defendants an incentive to present as little evidence as is necessary to create some doubt . . . Although defendants are entitled to the benefit of a reasonable doubt at trial, an appellate court should not overturn a conviction simply because the defendant has teasingly suggested that there may be facts out there that his trial counsel could have discovered and that would have helped his case.

*Id*.

Here, Petitioner sets forth only vague speculations in his Motion and Response as to what more time and investigation would have provided for the defense. Petitioner maintains that an investigation was necessary to "ascertain whether the persons disclosed as being present at the time of the shooting could have been the real shooter in the case . . . ." Pet'r Mot. at 15. This

general statement exemplifies exactly the sort of "teasing suggestion" of factual corroboration

that the *Askew* court eschewed as a basis for overturning a conviction.  *See Askew*, 88 F.3d at

1073.  Petitioner's Motion is replete with other examples of general and vague speculations as to

what additional investigation, by means of seeking a continuance, would have revealed.  *See*

Pet'r Mot. at 15 - 19.  Petitioner simply has not shown the Court what counsel might have

uncovered with more time to investigate.  Additionally, quite far from "winging it,"  trial counsel

for Petitioner and co-defendants were able to effectively cross-examine Eddings using the

disclosed pre-trial statements, and succeeded in presenting evidence to the jury that both Thomas

and Young had motives for killing Leroy Copeland.  *See, e.g.*, Tr. 5:26-31 (defense counsel

vigorously cross-examine Eddings to suggest that the person with "Head" at the playground, Kirk

"Dog" Thomas, was the shooter).[13]

---

[13] W. Gregory Spencer, Petitioner's trial counsel, provides in his November 2000 affidavit: "I did not have any information, nor did I think that there was any information in Eddings' statements that might lead to anything that might really help Mr. Wilson's case.  We cross-examined Eddings with information obtained from these statements and used information from these statements to assist in cross-examination of other government witnesses."  App. G to Gov't Opp'n ¶ 7.

Counsel for co-defendant Louis Wilson, the accused shooter, elicited from Eddings that he had stated that a photograph of Louis "resembled" the shooter, but that he also was "positive that was the guy."  Tr. 6:118-119.  Eddings further explained that he had seen a guy at the playground who resembled the shooter in that they had "similar" jackets but that he never saw the face of the individual at the playground, and that the shooter, like the individual at the playground, wore a beige jacket and blue jeans.  Tr. 6:122-23, 152; 7:41, 45.

During cross-examination, Petitioner's counsel elicited from Eddings that:  (1) Copeland said the guy with "Head" at the playground said that he was "hot," and to run if that guy moved or came towards them, and when that guy got up they ran, *see* Tr. 6:134-36, 143; (2) he saw the guy from the playground at 5th and N, *see* Tr. 6:144; and (3) he saw the person who had been leaning on the wall of the store, whom he had also seen at the playground, shoot Copeland and this was not the person that he had run from at the playground, *see* Tr. 6:149, *but see* Tr. 6:151 (where Eddings said that the person who sat next to "Head" at the playground was the person who shot Copeland).

During cross-examination, Petitioner's counsel was able to impeach Eddings with:  (1)

Moreover, given the totality of the trial testimony from Eddings, Carrington, Young, and

Thomas, including identification of co-defendant Louis Wilson from all four witnesses, as well

as the other "nonconflicting, nonambiguous, and overwhelming evidence" against Petitioner and

his brother, *see United States v. Wilson*, 160 F.3d at 741 n.8, Petitioner fails to show there is a

reasonable probability that investigation into Eddings's statements would undermine the Court's

confidence in the outcome at trial, as required by *Strickland* for a finding of ineffective assistance

of counsel.  *See Strickland*, 466 U.S. at 694.  The Court simply cannot vacate, set aside, or

correct Petitioner's sentence absent a showing of prejudice to sustain Petitioner's claim of

ineffective assistance of counsel for failing to seek additional time to investigate.

> 3.    Failure to Request Continuance to Allow Reita Pendry to Represent Him at Trial

Petitioner's third claim of ineffective assistance of counsel rests on the notion that trial

counsel should have sought a continuance so that one of Petitioner's two attorneys, Ms. Reita

Pendry, could represent Petitioner at trial.[14]  Petitioner claims that Ms. Pendry was "best prepared

to represent his interests at trial."  Pet'r Mot. at 20.  Petitioner's claim may be summarily rejected

because Petitioner does not show that counsel's failure to request a continuance constituted

_____

his April 19, 1996 statement, wherein he said that "Head" and the guy with him "jumped up suddenly and made a quick movement that caused" him and Copeland to run, *see* Tr. 6:138; and (2) his grand jury testimony, wherein Eddings had testified that he and Copeland ran when the guy on the wall got up, *see* Tr. 6:142, and "Head" was by the church at 5th and O, *see* 6:145-47.

[14] Ms. Pendry fell ill as of January 23, 1997 and underwent surgery on January 27, 1997. 1/23/97 Tr. 53; 1/27/97 Tr. 125.  At this point in time, the trial court agreed to continue the case until February 6, 1997 for a motions hearing, February 26, 1997 for jury selection, and March 3, 1997 for trial testimony.  *Id.* at 128, 132, 134.  As of February 6, 1997, more than a month before trial testimony began, Mr. W. Gregory Spencer, another Assistant Federal Public Defender, took Ms. Pendry's place as co-counsel for Petitioner.  2/6/97 Tr. 218-221.

deficient performance, given that the decision to proceed with trial was a sound one.  Even

assuming that counsel's decision was in error, Petitioner fails to show that such deficient

performance prejudiced him.

First, trial counsel's decision not to seek a continuance was reasonable and calculated.

Mr. Spencer, who replaced Ms. Pendry, had ample experience and a month to prepare for trial.

*See* App. G to Gov't Opp'n ¶¶ 2, 3.  In his affidavit submitted with the Government's

Opposition, Mr. Spencer states: "When I entered the case I discussed Mr. Wilson's case in great

detail with Ms. Pendry, . . . and with Mr. Howard who handled the motions hearings along with

Ms. Pendry."  *Id.* ¶ 3.  Additionally, Mr. Spencer provides that "Mr. Howard and [he] consulted

regularly during the course of the trial with Ms. Pendry."  *Id.* ¶ 8.  Accordingly, Petitioner's trial

counsel were competent to represent him and had the assistance of Ms. Pendry in doing so.  Trial

counsel's failure to request a continuance is also reasonable in light of the inconvenience a

continuance would cause for litigants, witness, and the court, and the uncertainty as to the date of

Ms. Pendry's return to health.  Furthermore, court had already shown some unwillingness to

further delay the trial.  *See id.* ("The Court denied all of our pre-trial requests for Ms. Pendry to

assist us."); *see also* Att. 3 to Pet'r Mot. (Affidavit of Mr. Spencer indicating that he declined to

request a continuance based on the trial court's denial of previous requests for a continuance on

account of Ms. Pendry's health ).  In short, trial counsel's decision not to seek a continuance was

well within "the wide range of professionally competent assistance."  *Strickland*, 466 U.S. at 690.

Even assuming for the sake of argument that trial counsel's failure to request a

continuance constitutes deficient performance, Petitioner does not establish that failure

prejudiced him.  Petitioner has not provided the Court with any basis for concluding, as it must

before setting aside a conviction based on a claim of ineffective assistance of counsel, that if not for trial counsel's failure to request a continuance on account of Ms. Pendry, the outcome of trial would be different.[15]  Once again, Petitioner's claim does not overcome the overwhelming evidence supporting his conviction.

        4.    <u>Failure to Present Testimony from Steve Jacoby, Christine Huff, or Bernard Fernandez</u>

Next in Petitioner's Sixth Amendment arsenal of arguments is the claim that trial counsel failed to present "material witnesses who could have substantially supported defendant's trial defense."  Pet'r Mot. at 20.  Specifically, Petitioner argues that trial counsel should have called Steve Jacoby, attorney for James "Toe" Wilson, to support the claim that Petitioner had no reason for wanting Leroy Copeland killed and that Petitioner did not meet with Mr. Jacoby in order to discuss his brother's case.  However, the trial record plainly shows that Petitioner's trial counsel did in fact call Steve Jacoby, and that Mr. Jacoby testified that to the best of his knowledge, Petitioner accompanied Toe Wilson's wife to his office in order to provide her with transportation there.  *See* Tr. 8:156, 157.  Therefore, Petitioner's claim that trial counsel failed to present testimony from Steve Jacoby is patently unfounded.[16]

---

[15] Moreover, given the fact that Petitioner asserts that Ms. Pendry was ineffective before trial because she allegedly failed to explore plea negotiations, Pet'r Mot. at 23-24, and that she was ineffective upon appeal for failing to raise an alleged error in jury instructions, Pet'r Reply to Gov't Opp'n to Pet'r Supp. at 1-2, it is quite likely that Petitioner would have considered Ms. Pendry to be as "effective" as Mr. Spencer at trial.

[16] Petitioner later concedes that trial counsel called Mr. Jacoby as a witness at trial.  Pet'r Resp. at 10 n.4.  Ultimately, both the Government and Defendants Louis and Ralph Wilson called Mr. Jacoby as a witness.  *Id.*

Next, Petitioner contends that trial counsel should have called Christine Huff to corroborate the defense of a third-party shooter.  Without citing to the record, Petitioner claims that "[d]uring trial she seemed to indicate that she recognized an individual named 'Skeeter' as the possible shooter."  Pet'r Mot. at 21.  In fact, Ms. Huff was called as a witness for co-defendant Louis Wilson, and testified that she did not know who the shooter was.  *See* Tr. 8:111.  Indeed, the only person in the trial that suggested that the shooter's name might have been "Skeeter" was defense counsel, and the Government's objection to this inquiry was sustained because -- as it turned out -- Ms. Huff never said that the shooter's name might be "Skeeter." *Id.*[17]  Moreover, Ms. Huff, called as a witness for co-defendant Louis Wilson, was discredited by the testimony of Government rebuttal witnesses Judy Myers and Woody McCloud.  Finally, Petitioner has failed to present an affidavit from Ms. Huff setting forth any information concerning the identity of the shooter that she did not present already at trial.  Without any specific and detailed proffer of testimony from Ms. Huff, she can hardly be labeled a "material" witness.  As such, Petitioner cannot show that his trial counsel's failure to call Ms. Huff was unprofessional and ineffective, or that it prejudiced him in any way, let alone sufficiently to undermine the Court's confidence in the outcome of trial.  *Strickland*, 466 U.S. at 690, 694.

Finally, Petitioner alleges that trial counsel should have called Bernard Fernandez, a barbershop owner, to support Petitioner's claim that he was in Fernandez's barbershop at the time of the murder.  *Id*. at 21; *see* Att. 4 to Pet'r Mot. (Affidavit from Bernard Fernandez stating that Petitioner had been in shop 30-45 minutes when someone ran in and said that Leroy

---

[17] Petitioner ultimately concedes that "Ms. Huff did not identify the shooter as someone named 'Skeeter' . . . the name came from defense counsel's question."  Pet'r Resp. at 10.

Copeland had just been killed).  However, the Government never argued that Petitioner was at the scene of the murder, and Fernandez's statement might in fact help the Government's case because it actually places Petitioner close to the scene at the precise time of the murder when no one else had placed Petitioner close to the murder scene.  *See* Gov't Opp'n at 47.  Accordingly, because Mr. Fernandez's testimony is largely irrelevant, Petitioner cannot show how trial counsel's failure to present Fernandez's testimony at trial constituted unreasonable or deficient performance, or would have changed the outcome of the case.  *See Strickland*, 466 U.S. at 690, 694.  For these reasons, the Court finds that Petitioner's claim that trial counsel provided ineffective assistance for failing to call the aforementioned witnesses is without merit.

     5.      <u>Failure to Seek Recusal of Trial Counsel Due to Alleged Conflict of Interest</u>

In addition to the ineffective assistance claims described above, Petitioner claims that trial counsel provided ineffective assistance at trial for failing to seek to recuse the Federal Public Defender Service ("FPD") from representing him because the FPD also represented Mr. Leo Wright.[18]  Pet'r Mot. at 22.  Petitioner's theory is that because of the FPD's representation of Mr. Wright, his trial counsel failed to investigate whether Wright could have been involved in the death of Leroy Copeland, and therefore deprived Petitioner of a potential defense.  *Id.*  Petitioner's claim does not show that an actual conflict of interest existed, and therefore the

---

[18] By way of materials submitted by the government the night before Kirk Thomas' testimony, it came to the attention of the defense that Thomas had said that "rumors" on the street were that Copeland was wanted for cooperating against "Toe" Wilson and someone called "Peabody."  Gov't Opp'n at 48.  "Peabody" is the nickname of Mr. Leo Gonzales Wright, who was represented by the FPD attorneys A.J. Kramer and Reita Pendry.  Tr. 6:4, 5.  Petitioner's trial counsel brought this issue to the attention of the court the following morning.  *Id.*; App. G to Gov't Opp'n ¶ 6.

Court must reject the claim that his trial counsel's failure to recuse itself constituted ineffective assistance on this basis.

A claim of ineffective assistance of counsel based on an allegation of a conflict of interest enjoys a more lenient standard than most varieties of ineffective assistance claims.   In *Cuyler v. Sullivan*, the Supreme Court held that a petitioner who shows that "an actual conflict of interest adversely affected his lawyer's performance" does not need to establish prejudice in order to gain relief.  446 U.S. 335, 349-50, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).  However, the Court followed, "until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance. . . . The possibility of conflict is insufficient to impugn a criminal conviction."  *Id*. at 350.  "A defense attorney has an actual conflict when he is 'required to make a choice advancing [another client's] interest to the detriment of his client's interest."  *United States v. Gantt*, 140 F.3d 249, 254 (D.C. Cir. 1998) (quoting *United States v. Bruce*, 89 F.3d 886, 893 (D.C. Cir. 1996) (internal quotations omitted)).   Accordingly, Petitioner must show that his trial counsel actively advanced Leo Wright's interest to Petitioner's detriment in order to prevail on his claim.

Petitioner argues in conclusory fashion that a conflict of interest existed in this case, alleging that Wright might have a motive for the killing of Copeland but provides no factual basis for this conclusion.  He ultimately fails to demonstrate any actual conflict, that is, to show how and when the FPD was required to advance Leo Wright's interest to the detriment of Petitioner's.  In fact, Wright's case was resolved prior to Petitioner's arrest in this case, making it

impossible for the FPD to advance Wright's interest over Petitioner's.[19]  Additionally, as

indicated in Mr. Spencer's affidavit attached to the Government Opposition, neither Mr. Howard

nor Mr. Spencer, who represented Petitioner at trial, was ever involved in Wright's case.  App. G

to Gov't Opp'n ¶ 6 ("Specifically, neither Mr. Howard nor myself was involved in Mr. Wright's

case at all.").  Furthermore, Mr. Spencer provides that he discussed the possibility of a conflict of

interest with A.J. Kramer, Federal Public Defender, and Petitioner, and they collectively decided

to proceed with the trial, from which it may be inferred that counsel was not privy to any

information helpful to Petitioner.  *Id.*  Therefore, Petitioner never makes the required showing of

an actual conflict of interest that would deprive him of his Sixth Amendment right to effective

assistance of counsel.  As such, the Court shall not set aside Petitioner's sentence on this basis.

6.     Failure to Explore Plea Negotiations

In his last ineffective assistance of counsel claim, Petitioner alleges that his pre-trial

counsel -- Ms. Pendry -- rendered deficient performance for failing to explore plea negotiations

with the Government.  The Court finds no evidence on the record that Petitioner ever entertained

the idea of negotiating a plea or showed any willingness to accept one if the Government offered

one, nor does the record show that the Government ever suggested or made a plea offer to

Petitioner.  In Petitioner's Affidavit, submitted as Attachment 5 to his Motion, he provides that

he "requested that Attorney Pendry seek a plea agreement for [him]," but she did not do so.  Att.

5 to Pet'r Mot. ¶¶ 4-5.  Petitioner, however, does not provide an affidavit from Ms. Pendry to

---

[19] The Court notes that Wright's cases were resolved by guilty plea on September 9, 1996, and thereafter only sentencing matters remained, which were finally resolved on March 20, 1997. *See* Criminal Case Nos. 96-066 and 96-297; see also App. G to Gov't Opp'n ¶ 6; Att. 7 to Pet'r Mot. (affidavit from A.J. Kramer).

support or refute this proffer.  On the other hand Mr. Spencer, who entered an appearance one month prior to trial and served as counsel for Petitioner during trial in Ms. Pendry's absence, recalls that for the duration of the time he represented Petitioner, "Mr. Wilson never asked that I pursue a plea offer from the government."  App. G to Gov't Opp'n ¶ 9.

Even assuming Petitioner's allegation that he asked Ms. Pendry to seek a plea is true, Petitioner still does not provide any evidence that he would have accepted such a plea, nor any evidence to suggest that the government was willing to make an "unwired" offer in the first place.  *See United States v. Thompson*, 27 F.3d 671, 675 (D.C. Cir. 1994), *cert. denied*, 513 U.S.1050, 115 S.Ct. 650, 130 L.Ed.2d 554 (1994) ("[I]t takes two to trade . . . [and] the fact that [a defendant] might well have initiated plea negotiations does not mean that those negotiations would have been successful."); *Diaz v. United States*, 930 F.2d 832, 835 (11th Cir. 1991) (defendant's "after the fact testimony concerning his desire to plead, without more, is insufficient to establish that but for counsel's alleged advice or inaction, he would have accepted the plea offer") (citation omitted)).  Furthermore, trial counsel's failure to pursue a plea bargain that he had no reason to think existed cannot be considered unreasonable, and therefore does not constitute deficient performance in accordance with the standard set forth in *Strickland*.  466 U.S. at 688-89; *cf. Holland*, 117 F.3d at 594; *Glover*, 153 F.3d at 758 (D.C. Cir. 1998).  Finally, Petitioner in his affidavit does not indicate that he would have or would now entertain pleading to the indictment or entering an *Alfred* plea, two decisions that would not have required an agreement with the Government.

### B.    *Confrontation Rights Claim*

In his second Sixth Amendment claim, Petitioner argues that his Confrontation Clause

rights were violated at trial.  Pet'r Mot. at  26-27.  Specifically, Petitioner claims that the

introduction of two different statements made by others at trial contravened the guarantees of the

Confrontation Clause:  (1) the statements of James Wilson made in the July 28, 2005, Lorton

conversation with Copeland, and (2) statements in conversation by co-defendant Marcellus Judd

to both Kirk Thomas and Steven Hamilton the day after Copeland was murdered, which were

admitted by the trial court as "statements against his penal interest."  *Id.*

Importantly, the district court's admission of these two sets of statements was upheld on

appeal by the D.C. Circuit.  *See Wilson*, 160 F.3d at 738 n.14 (finding that the trial court did not

err in admitting Judd's statements, and noting that the reversal of Judd's conviction for

insufficient evidence "does not alter our conclusion that his statements were admitted against his

penal interest") & 744-46 (finding that the trial court did not err in admitting the unedited tapes

of the Lorton conversation).  However, Petitioner cites to a more recent decision by the United

States Supreme Court -- *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177

(2004) -- decided well after his trial, sentencing, and appeal as support for the proposition that

admission of these statements violated the Sixth Amendment's Confrontation Clause guarantee.

*See* Pet'r Notice of New Case Authority at 1.

Upon an examination of Petitioner's Confrontation Clause argument, it is clear that his

claim fails for two basic reasons:  (1) Petitioner may not invoke *Crawford* because it announced

a new rule of criminal procedure that may not be retroactively applied on collateral attack; and

(2) assuming *arguendo* that *Crawford* was applicable, the statements at issue were not

"testimonial," and therefore did not implicate *Crawford*'s basic holding.

1.      *Crawford* May Not Be Retroactively Applied  to Petitioner's Case

Petitioner's trial concluded on March 21, 1997, his appeal was denied by the D.C. Circuit

on November 20, 1998, and his conviction and sentence became final on October 4, 1999, when

the Supreme Court denied his petition for a writ of certiorari.  *See Clay v. United States*, 537 U.S.

522, 527, 123 S.Ct. 1072, 155 L.Ed.2d 88 (2003) (conviction becomes final when Supreme Court

"affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or

when the time for filing a certiorari petition expires").  In contrast, the *Crawford* decision, which

abrogated *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) by holding that

out-of-court statements that are testimonial are barred under the Confrontation Clause unless

witnesses are unavailable and defendants had prior opportunity to cross-examine them, regardless

of whether such statements are deemed reliable by the trial court, was issued by the United States

Supreme Court on March 8, 2004.  Accordingly, nearly five years had passed before Petitioner's

conviction became final and the *Crawford* decision was issued.

It has long been held that "new constitutional rules of criminal procedure will not be

applicable to those cases which have become final before the new rules are announced."  *Teague*

*v. Lane*, 489 U.S. 288, 310, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).  The principle elucidated in

*Teague* rests on the understanding that the purpose of collateral review is to ensure that courts

conduct their proceedings in a manner consistent with the law in existence at that time, "not to

provide a mechanism for the continuing reexamination of final judgments based upon later

emerging legal doctrine."  *Sawyer v. Smith*, 497 U.S. 227, 234, 110 S.Ct. 2822, 111 L.Ed.2d 193

(1990).  There are two exceptions to the *Teague* rule prohibiting the application of "new rules" to

cases where the conviction has already become final, as is the case here.  First, a new rule should

be applied retroactively if it places "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe." *Teague*, 489 U.S. at 311, 109 S.Ct. 1060; *Sawyer*, 497 U.S. at 241, 110 S.Ct. 2822 (the first exception applies to new rules that place "an entire category of primary conduct beyond the reach of the criminal law"). Second, a new rule should be applied retroactively if it constitutes a "watershed rule[] of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Saffle v. Parks*, 494 U.S. 484, 495, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990). However, the Supreme Court "has yet to find a new rule that falls under the second *Teague* exception," *Beard v. Banks*, 542 U.S. 406, 124 S.Ct. 2504, 2513-14, 159 L.Ed.2d 494 (2004), as "'it is clearly meant to apply only to a small core of rules requiring observance of those proceedings that . . . are implicit in the concept of ordered liberty,'" *id.* at 2513 (quoting *O'Dell v. Netherland*, 521 U.S. 151, 157, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997)).

The *Teague* decision does not bar the retroactive application on habeas of substantive statutory decisions, and applies only to procedural rules. *See Bousley v. United States*, 523 U.S. 614, 620, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998); *United States v. McKie*, 73 F.3d 1149, 1153 (D.C. Cir. 1996). Therefore, when a petitioner attempts to claim the benefit of a judicial opinion issued after he is convicted, the court must first determine whether the opinion announces a rule of criminal procedure or whether it is a substantive rule. *See Schriro v. Summerlin*, 542 U.S. 348, 124 S.Ct. 2519, 2523, 159 L.Ed.2d 442 (2004). If the court determines that the rule is procedural, the court must then conduct a three-step *Teague* analysis. *See Beard*, 124 S.Ct. at 2510. First, the court must ascertain the date on which the defendant's conviction became final. *Id.* Second, the court must "survey the legal landscape as it then existed" and determine whether

the court considering the defendant's claim at the time the conviction became final "would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution." *Caspari v. Bohlen*, 510 U.S. 383, 390, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994). Third, even if the court determines that the defendant seeks the benefit of a new rule, the court must still decide whether the rule falls within "one of the two narrow exceptions to the nonretroactivity principle." *Id.* Furthermore, if the government raises a *Teague* argument, the court "must apply *Teague* before considering the merits of the claim." *Id.*; *United States v. Pettigrew*, 346 F.3d 1139, 1144 n.9 (D.C. Cir. 2003).

Here, it is clear that the case at issue -- *Crawford v. Washington* -- announced a new constitutional rule of criminal procedure, rather than a substantive rule of law. The holding in *Crawford* does not alter the range of conduct made criminal or the class of persons to be punished, *see Schriro*, 124 S.Ct. at 2523; rather, it "regulate[s] only the *manner* of determining the defendant's culpability" and is therefore "procedural," *id.* (emphasis in original). *See, e.g.*, *Crawford*, 124 S.Ct. at 1370 ("To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but that is a procedural rather than a substantive guarantee."). Because *Crawford* announced a rule of criminal procedure, and not a substantive rule of law, *Teague* is implicated and the Court must conduct the traditional three-step analysis pursuant to its dictates.

First, as noted previously, Petitioner's conviction and sentence became final on October 4, 1999. Second, an examination of the legal landscape on October 4, 1999, reveals that *Crawford* was <u>not</u> dictated by existing precedent at that time. It is quite clear that *Crawford* represented a dramatic reversal of the general approach set forth in *Roberts*. Under *Roberts*, the unavailable declarant's out-of-court hearsay statements were admissible pursuant to the

Confrontation Clause only if the trial judge made a preliminary determination that the statement

bore "adequate 'indicia of reliability'" by falling within a "firmly rooted hearsay exception" or

bearing "particularized guarantees of trustworthiness."  448 U.S. at 66, 100 S.Ct. 2531.  The

Supreme Court's decision in *Crawford* flatly rejected this approach, noting that "[w]here

testimonial statements are at issue, the only indicium of reliability sufficient to satisfy

constitutional demands is the one the Constitution actually prescribes:  confrontation."  124 S.Ct.

at 1374.  The *Crawford* Court's stunning abrogation of the *Roberts* doctrine was neither

anticipated nor dictated by existing precedent at the time Petitioner's conviction and sentencing

were finalized in this case.  *See, e.g.*, *United States v. Saget*, 377 F.3d 223, 226 (2d Cir. 2004)

("Until *Crawford* was decided in March 2004, the scope of a defendant's Confrontation Clause

rights was delineated by *Roberts* . . . ."); *Murillo v. Frank*, 316 F. Supp. 2d 744, 750 (E.D. Wis.

2004) ("Until the Court's recent decision in *Crawford*, *Ohio v. Roberts* provided the framework

for determining the admissibility of out-of-court statements under the Confrontation Clause.");

*Johnson v. Renico*, 314 F. Supp. 2d 700, 706 (E.D. Mich. 2004) ("At the time of petitioner's

conviction and direct appeal, however, *Ohio v. Roberts* was still good law.").  Accordingly,

*Crawford* must be considered a "new rule" for the purposes of *Teague*.  *Id.*

   Third, *Crawford* does not fit within one of the two *Teague* exceptions, which -- as noted

previously -- apply to new rules that (1) place "certain kinds of primary individual conduct

beyond the power of the criminal law-making authority to prescribe," or (2) constitute

"watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the

criminal proceeding."  *Teague*, 489 U.S. at 311, 109 S.Ct. 1060.  The first exception is clearly

inapplicable, as the rule first announced in *Crawford* did not place any kind of conduct beyond

27

the reach of criminal law.  The second exception, which has never been utilized, is equally

inapplicable, as *Crawford* does not constitute the type of watershed rule that implicates either

fundamental fairness or accuracy to such a degree as to be "implicit in the concept of ordered

liberty."  *Graham v. Collins*, 506 U.S. 461, 478, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993); *Saffle*,

494 U.S. at 495, 110 S.Ct. 1257 (to fit within the second *Teague* exception, the new rule must

have "the primacy and centrality of the rule adopted in *Gideon* [*v. Wainwright*, 372 U.S. 335, 83

S.Ct. 792, 9 L.Ed.2d 799 (1963)]").  While important, the *Crawford* decision does not meet these

exacting standards, especially given the fact that any claim of its "watershed" implications is

diminished by the fact that violations of its rule are subject to harmless error review.  *See Coy v.

Iowa*, 487 U.S. 1012, 1021-22, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988) (Confrontation Clause

violations are subject to harmless error review); *Crawford*, 124 S.Ct. at 1378 (Rehnquist, J.,

concurring) ("Likewise, to the Court's credit is its implicit recognition that the mistaken

application of its new rule by courts which guess wrong as to the scope of the rule is subject to

harmless-error analysis.").

Accordingly, this Court joins with the other jurisdictions that have considered the issue

and concludes that *Crawford* is not retroactively applicable to cases on collateral review, and

therefore inapplicable to Petitioner's instant claims.  *See Evans v. Luebbers*, 371 F.3d 438, 444

(8th Cir. 2004); *Hiracheta v. Attorney Gen. of Cal.*, 105 Fed. Appx. 937, at *1 (9th Cir. 2004);

*Murillo*, 316 F. Supp. 2d at 749-50 & n.4; *Wheeler v. Drake*, Civ. No. 04-026, 2004 WL

1532178, at *1 n.1 (N.D. Tex. July 6, 2004).  Accordingly, *Ohio v. Roberts* governed the relevant

Confrontation Clause issues at the time of Petitioner's trial, and -- as noted on appeal by the D.C.

Circuit -- the admission of the Lorton conversation and the Judd statements were permissible

under the Sixth Amendment at that time.  *See Wilson*, 160 F.3d at 738 n. 14, 745.  Accordingly,

Petitioner's claim must fail.

> 2.    Even if *Crawford* Was Applicable, the Relevant Statements Were
>         Admissible Because They Were Not "Testimonial"

Even assuming *arguendo* that *Crawford* could be retroactively applied to Petitioner,

Petitioner would not be entitled to relief because *Crawford* is inapplicable to the statements that

he has identified.  First, *Crawford* has no effect on statements such as the one made by Judd and

introduced by Hamilton and Young.  Evidence was presented at trial that co-defendant Judd told

Hamilton and Young after Copeland's murder that it was he who "went and got" the "Wilsons"

before the murder and told them that "Copeland was around here."  Tr. 3/6/97, vol. 5, at 42-43,

178.  The D.C. Circuit upheld the admission of these statements because the statements were

reliable, in that they implicated Judd as well as Louis and Ralph Wilson.  *Wilson*, 160 F.3d at

739-41.  The D.C. Circuit further emphasized that "Judd's statements were not contained in a

confession to law enforcement individuals.  He made the statements to lay persons with whom he

had no motive or incentive to diminish his role by shifting blame."  *Id.* at 741.  These kind of

casual statements to acquaintances fall outside of the strictures of *Crawford*, and do not violate

the Confrontation Clause.  *See United States v. Lee*, 374 F.3d 637, 644-45 (8th Cir. 2004)

("casual statements to an acquaintance are not testimonial" under *Crawford*); *Horton v. Allen*,

370 F.3d 75, 84 (1st Cir. 2004) (concluding that statements were non-testimonial, and that

*Crawford* did not apply, because the statements were made during a private conversation with

another civilian, and stating that "[i]n short, [the declarant] did not make the statements under

circumstances in which an objective person would 'reasonably believe that the statement would

be available for use at a later trial'") (quoting *Crawford*, 124 S.Ct. at 1364).

Second, and similarly, the taped Lorton conversation between Copeland and James Wilson was not "testimonial" for the purposes of *Crawford*. Importantly, James Wilson did not know that Copeland -- to whom he referred to as his "boy" and "son," GX32A:11, 15-21 -- was working with law enforcement and tape-recording their conversation. From his perspective, James Wilson was having a casual conversation with a friend, rather than making a statement to law enforcement. As such, his statements fell outside of the concerns illuminated in *Crawford*. *See United States v. Manfre*, 368 F.3d 832, 838 n.1 (8th Cir. 2004) (noting that comments made to loved ones or acquaintances do not fall within the penumbra of "testimonial statements" addressed in *Crawford*). Indeed, as the Second Circuit held in *Saget*, "a declarant's statements to a confidential informant, whose true status is unknown to the declarant, do not constitute testimony within the meaning of *Crawford*." *Saget*, 377 F.3d at 229-30.

Accordingly, even if *Crawford* applied retroactively to Petitioner's Confrontation Clause claim, Petitioner's argument would be without merit. Simply, the Lorton conversation and the Judd statements introduced during his trial do not implicate the Sixth Amendment's Confrontation Clause, as neither set of statements could be considered "testimonial" for the purposes of *Crawford*.

    C.    *Brady Claim*

Petitioner's Fifth Amendment claim alleges that the Government tardily disclosed information in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); specifically, Petitioner contends that the Government "provided little information to defense counsel about the various grounds for Mr. Copeland being in the witness protection

program prior to James Wilson's case" and "had the Eddings statements well in advance of trial but withheld them until the last minute denying the defendant an opportunity to make effective use of them in investigating a defense."  Pet'r Mot. at 24.

In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment . . . ."  *Brady*, 373 U.S. at 87, 83 S.Ct. 1194.  Since the holding in *Brady*, the Supreme Court has summarized the standard for a "*Brady* violation":

> There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

*Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).  The *Strickler* Court also explained the standard for prejudice: "[T]here is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Id.* at 281.

The Court shall begin by analyzing Petitioner's argument regarding Mr. Copeland's alleged placement in the witness protection program, and then shall turn to an examination of his assertion that the disclosure of Mr. Eddings's statements was wrongfully delayed.

### 1.    Copeland, Witness Protection, and *Brady*

Petitioner contends that the Government failed to reveal to the defense that Copeland had been in the witness protection program prior to the instigation of James Wilson's case, a fact that Petitioner claims established that others had a motive to murder Copeland.  Pet'r Mot. at 24-25 & n.7.  However, pursuant to its pretrial obligations, it is undisputed that the Government provided

defense counsel with the names of all of the individuals against whom Copeland had provided information to law enforcement and information concerning any other prior suspects in the murder on December 23, 1996. *See* Gov't Opp'n, Appx. E at 3-4. As such, Petitioner clearly was provided with the information necessary to establish that others might have possessed a motive to murder Copeland.

Moreover, Petitioner's contention that Copeland was actually in the witness protection program appears to be erroneous. Counsel for co-defendant Marcellus Judd mentioned in his opening statement that Copeland was in the witness protection program -- a statement to which the Government objected. Tr. 2:66. During its opening statement, the Government noted that "the day before [James Wilson's] trial was to start Monday, the 25th, the prosecutors wanted to meet with Leroy Copeland. Leroy Copeland at the time had not entered a witness protection program, but had moved south and moved his family south." Tr. 2:45. Further, Government witness Jerold Bamel, an FBI special agent, provided the only evidence on the subject and substantiated the Government's statement, as he testified upon cross-examination that he and Copeland had discussed Copeland's going into the witness protection program but that Copeland was never in the witness protection program, and that just prior to Wilson's trial, Copeland was living out of town. Tr. 2A:2, 25-26. Finally, during the cross-examination of Special Agent Bamel, it was elicited that Copeland also gave information on the location of fugitives, murders that occurred during the 1980s, and current cases for a total of about ten cases. Tr. 2A: 30, 48.[20]

---

[20] At this point, defense counsel attempted to inquire as to the names of specific cases also being worked on by Copeland. Tr. 2A:49. Despite the proffer of defendant's counsel that one of the defense theories was that because Copeland was assisting the Government on several cases, individuals involved in those other cases had "the motive and possibly the opportunity to commit the murder in this cases," *id.*, the trial court denied defense counsel's request to inquire

Given these disclosures, it is evident that the Government met its *Brady* obligations prior to trial with respect to other possible suspects or the motives of other individuals to murder Copeland.  Indeed, Petitioner has failed to set forth with any specificity any information to contradict the Government's claims that (1) Copeland's murder had nothing to do with anything other than his assistance in the case against James Wilson, and (2) that Copeland had not been placed in the witness protection program.  As such, Petitioner has not established a *Brady* violation pursuant to this claim.  *See United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) ("the prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial").

2.   The Disclosure of Mr. Eddings's Statements

Petitioner next claims that he is entitled to a new trial pursuant to *Brady* because the Government disclosed two statements by Kevin Eddings the day before trial as Jencks material. *See* Pet'r Mot. at 24-25.  Under the test for a *Brady* violation as set forth in *Strickler*, Petitioner must show that Eddings's statements were favorable to Petitioner's case; that the statements were suppressed by the government; and that it is reasonably probable that the result of trial would have been different had the government disclosed the statements.  *Strickler*, 527 U.S. at 281-82, 119 S.Ct. 1936.

Although Petitioner fails to make it clear in his brief, it seems that the *Brady* information at issue in the instant motion is Kevin Eddings's statements to the grand jury and the police that

---

or to make an offer of proof of the names of these other individuals, Tr. 2A:50.  This ruling was upheld by the D.C. Circuit on appeal.  *See Wilson*, 160 F.3d at 732.

he told the government that he was not sure whether it was Glenn Young or Petitioner who shot

Leroy Copeland, *see* Att. A to Pet'r Mot at 2, as well as Eddings's pre-trial statements that

another witness, Glenn Young, was near Copeland at the time Copeland was shot.  *See* Att. B to

Pet'r Mot.,  Pet'r Mot. at 10.  The pre-trial statements, given to a police investigator and before a

grand jury on May 1, 1996, were included with materials provided to defense counsel by the

government on the evening preceding Kevin Eddings's testimony at trial.  *See* Att. H to Gov't

Opp'n; Gov't Opp'n at 26.

     First, as to the contents of Kevin Eddings's September 2000 affidavit, stating that he was

not sure whether it was Petitioner or Glenn Young who shot Leroy Copeland, *see* Att. A to Pet'r

Mot. at 2, this is refuted by Eddings's testimony before the police, a grand jury, and at trial

identifying Petitioner as the man who shot Leroy Copeland.  *See, e.g.*, Tr. 6:118-119, 122-23,

6:134-36, 138, 142, 144-47, 149, 151-52; 7:41, 45.  Next, the fact that the government disclosed

the information in Eddings's grand jury testimony prior to trial refutes Petitioner's contention

that the evidence was suppressed and a *Brady* violation ensued.  Attorneys for Petitioner and his

co-defendants had the knowledge that Glenn Young was near Leroy Copeland at the time of his

death in hand at trial.  In addressing a similar argument on appeal,[21] the D.C. Circuit noted that "a

new trial is rarely warranted based on a *Brady* claim where the defendants obtained the

information in time to make use of it."  *United States v. Wilson*, 160 F.3d at 742 (citing *United*

---

[21] On direct appeal, co-defendant Ralph Wilson raised the issue that statements by Kevin
Eddings regarding Kirk Thomas, also part of Eddings's grand jury testimony and provided to
defense counsel the day before trial, were disclosed too late.  *United States v. Wilson*, 160 F.3d at
741.  Under Petitioner's theory, the late disclosure deprived the defense of a viable third-party
shooter defense.  The D.C. Circuit held that no *Brady* violation had occurred since appellants
(Petitioner and his brother) "made effective use of the statements at trial."  *Id.* at 741, 742.

*States v. Dean*, 55 F.3d 640, 653 (D.C. Cir. 1995); *United States v. Paxson*, 861 F.2d 730, 737

(D.C. Cir. 1988); *United States v. Tarantino*, 846 F.2d 1384, 1417 (D.C. Cir. 1988)).  Defense

counsel obtained Eddings's statements in time to use them at trial, and in fact did so during

cross-examination of Eddings.  *See* Gov't Opp'n at 30 n. 23, 31.  Upon cross-examination of

Eddings and Kirk Thomas, counsel for Petitioner and co-defendants were able to present

evidence that both Kirk Thomas and Glenn Young had a motive for shooting Leroy Copeland.

Tr. 6:84-85; *see* Gov't Opp'n at 31.

Moreover, even if Eddings's statements could be considered as disclosed untimely,

Petitioner fails to show how confidence in the outcome at trial would be undermined with earlier

knowledge of Eddings's statements.   The alleged nondisclosure of Eddings's statement that

Glenn Young was near Leroy Copeland at the time of the murder does not rise to the level of a

*Brady* violation because Petitioner has not shown that it is reasonably probable that such

information would have led to a different result at trial.  *See Strickler*, 527 U.S. at 281, 119 S.Ct.

1936.  Petitioner speculates that Eddings's statements would have impeached him and

discredited his identification of Petitioner as the shooter, and set off a cascade of doubt

surrounding the other eyewitness testimony from Young, Carrington, and Thomas.  *See* Pet'r

Mot. at 9, 13.  However, Petitioner overlooks the weight of the evidence against him, and does

not overcome that weight to show that the trial outcome would have been different with earlier

knowledge of Eddings's statements.  *See United States v. Wilson*, 160 F.3d at 742.  As such, the

Court concludes that given (1) that the statements in question were not suppressed, (2) that

defense counsel was able to use to statements to impeach Eddings in an effective manner, and (3)

Petitioner has not established that the result of the trial would have been altered by a more timely

disclosure, Petitioner does not make the necessary showing of a violation of *Brady v. Maryland* in order for the Court to grant his Section 2255 motion on those grounds.

      D.     *Improper Jury Instructions Claim*

      In Petitioner's Supplemental Motion and Memorandum, he argues that the jury was improperly instructed as to Count Two of the indictment, charging him with the killing of a Government witness in violation of 18 U.S.C. § 1512(a)(1)(A). Pet'r Supp. at 1-3. Petitioner contends that the Court ought to have instructed the jury as to the element of killing in this charge, specifically that the Court should have instructed the jury on malice aforethought. *Id.* at 2. Petitioner claims that this failure resulted in a miscarriage of justice that jeopardized the "very fairness and integrity of the trial itself." *Id.* at 2-3.

      Two central problems exist with Petitioner's claim. First, it is undisputed that the defense did not object to the instruction at trial. *Id.* at 2. Moreover, Petitioner failed to raise his improper jury instruction on direct appeal. *See* Gov't Opp'n to Pet'r Supp. at 4; Pet'r Reply to Gov't Opp'n to Pet'r Supp. at 2 ("Petitioner observes the failure to raise this issue either at trial or on appeal is apparent from the fact of the court records . . . ."). It is well settled that a defendant is procedurally barred from raising a claim on collateral attack if he failed to raise that claim at trial or on direct appeal, unless he can establish "cause" excusing his double procedural fault, and "actual prejudice" resulting from the errors of which complains. *Bousley*, 523 U.S. at 622, 118 S.Ct. 1604; *United States v. Frady*, 456 U.S. 152, 167-68, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). In his Supplemental Motion, Petitioner failed to offer any "cause" for his failure to challenge either at trial or on direct appeal this Court's jury instruction with regard to his Section 1512(a)(1)(A) offense. *See* Pet'r Supp. at 1-3. In his Reply, after the Government had pointed

out this fact, Petitioner makes the cursory statement that his failure was due to the ineffectiveness of his counsel. *Id.* at 2.  In support of this conclusory claim, Petitioner makes no reference to how counsel's efforts in this regard violated the *Strickland* standard and instead simply claims (erroneously) that "his trial counsel and counsel on appeal were one and the same and he was not advised or given the opportunity to raise the issue." *Id.*[22]  Petitioner's conclusory assertions are simply insufficient to establish the "cause" necessary to overlook his procedural failing.

Second, even assuming *arguendo* that Petitioner had met his procedural obligations or could show the "cause" necessary to excuse his procedural default, his claim is without merit -- i.e., he cannot show the kind of "actual prejudice" necessary to support his contention that a fundamental error occurred.  Petitioner was charged with the offense of killing a witness under 18 U.S.C. § 1512(a)(1)(A), which provides in relevant part that "[w]hoever kills or attempts to kill another person, with intent to . . . prevent the attendance or testimony of any person in an official proceeding . . . shall be punished as provided in paragraph (3)."  Paragraph (3) specifies the punishment for murder as the death penalty or life imprisonment.  *See* 18 U.S.C. § 1512(a)(3).  Contrary to Petitioner's assertion, this offense does not require an instruction regarding premeditation and/or malice aforethought.  *See Duarte v. United States*, 289 F. Supp. 2d 487, 490 (S.D.N.Y. 2003)*, aff'd*, --- Fed. Appx. ----, 2005 WL 1527787 (2d Cir. June 28, 2005) (rejecting a challenge, pursuant to *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), to the absence of a jury finding of premeditation under Section 1512(a)(1)(A), and holding that a jury finding of premeditation was not necessary for the

---

[22] Petitioner's counsel at trial were Messrs. David Howard and Gregory Spencer, of the Federal Public Defender Service, while his counsel upon appeal was Ms. Reita Pendry, also of the FPD.

imposition of a life sentence under this section).  Indeed, the D.C. Circuit, in rejecting co-

defendant Louis Wilson's claims that his D.C. conviction for premeditated first-degree murder

while armed merged with his federal convictions for killing a witness, emphasized that "[t]he

D.C. Code section requires premeditation, an element not present in either of the federal

offenses." *Wilson*, 160 F.3d at 748 n.20.[23]  As such, because the offense charged in Count Two

of Petitioner's indictment did not require an instruction on premeditation or malice aforethought,

the trial court's failure to give such an instruction was not erroneous and Petitioner is not entitled

to relief.

     E.     *Evidentiary Hearing Not Necessary*

     Petitioner requests an evidentiary hearing on his Section 2255 motion, however

Petitioner does not meet the threshold of establishing "detailed and factual" allegations which

would require discussion beyond the Court's treatment in this Memorandum Opinion.

*Machibroda*, 368 U.S. at 495, 82 S.Ct. 510.  Nothing in Petitioner's motion necessitates the

consideration of any information not within the briefings and record before the Court.  The Court

finds that Petitioner's ineffective assistance of counsel claims are speculative and do not require

a hearing absent the required showing of prejudice to Petitioner.  *See United States v. Morrison*,

98 F.3d at 626 ("[A] summary denial of a § 2255 motion is appropriate when the ineffective

assistance claim is speculative."); *United States v. Sayan,* 968 F.2d 55, 66 (D.C. Cir. 1992)

("[W]hen a section 2255 motion involves ineffective assistance of counsel claims, no hearing is

---

[23] Even if an instruction was warranted, Petitioner could not establish prejudice from the failure to provide such an instruction given the fact that he was also convicted for premeditated first-degree murder while armed -- a charge which the trial court did give an instruction regarding premeditation.  *See* Tr. 3/17/97, vol. 12, at 31-32.

necessary if the alleged deficiencies of counsel did not prejudice the defendant."); *United States v. Fennell*, 53 F.3d 1296, 1304 (D.C. Cir. 1995) ("With two exceptions, claims of ineffective assistance of counsel require a fact-finding hearing, . . . One exception occurs when the trial record alone conclusively shows that the [petitioner] is entitled to no relief.").  Nor does Petitioner's *Brady* claim require a hearing, as Petitioner has not met the requisite standards necessary to establish a *Brady* violation.

## IV:  CONCLUSION

Petitioner's motion for collateral relief pursuant to 28 U.S.C. § 2255 does not mount a challenge sufficient to convince the Court that Petitioner's sentence was fundamentally unfair or imposed in violation of the United States Constitution.  Petitioner's Sixth Amendment claims, based on various allegations of ineffective assistance of counsel, lack merit.  Petitioner does not establish prejudice, such that if not for his trial counsel's alleged deficiencies, the result of Petitioner's trial would have been different.  The Court finds that the filings and record of this case show conclusively that Petitioner is not entitled to the requested relief, and therefore there is no need for a hearing on the instant Motion.  For the reasons set forth above in this Memorandum Opinion, the Court shall deny Petitioner's Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255.  An Order accompanies this Memorandum Opinion.

Date:   August 30, 2005

_____     */s/*_____
                                      COLLEEN KOLLAR-KOTELLY
                                      United States District Judge